We're here for oral arguments today. We're going to begin with Appeal 21-1775 et al. Indemnity Insurance Company v. Westfield Insurance Company et al. And we're going to begin with oral argument from Mr. Orlando. Good morning, Your Honors. Tom Orlando on behalf of the appellants, IINA. May it please the Court. At issue is whether IINA had a defense obligation. Resolution of this issue turns on the interpretation and application of the other insurance provisions because they govern the extent of any duty IINA had. If there was no duty at all, it does not matter if the sandstone defendants tendered or if their retender of defense to IINA was valid. Only if there is a duty to defend does the Targeted Tender Doctrine enter the picture. So I'm going to start with the other insurance provisions. Mr. Orlando, should we allow the Illinois Supreme Court to speak to that under certification? Interested in your thoughts on certification. In the Targeted Tender context? I don't think it's necessary in this case. As a threshold matter, again, I think the case is resolvable based on the other insurance provisions, and then we don't even get to the Targeted Tender Doctrine. But if the court were to affirm the district court's ruling on the other insurance provision and we do get into the Targeted Tender issue, I think the case law that it does exist, even though the particular issue has not been addressed by the Illinois Supreme Court, I think there's enough guidance from the Illinois Supreme Court and lower courts to guide the court here. Thank you. With respect to the other insurance provision, I think the parties all agree that it's the other insurance provision in the IINA policy that is the starting point for this. Mr. Orlando, it seems that we're a little bit limited here when you look at the introductory language to other insurance, which provides that if other valid and collectible insurance is available to the insured for a loss. It seems like we're a little bit limited here because we don't have a verdict, unlike other cases where we know what the loss specifically is based on what the jury finds. But here we just have the complaint. Right. So I think in this case you have to look at the loss in the context of the circumstances that give rise to a duty to defend, which is at the point in time a complaint is filed against an insured, the insured lets its insurance companies know we've been sued, and it's at that point that the insurance companies have to decide whether or not they have a duty to defend under their policy. So in that context and at that point in time, the loss is an alleged loss, and the Marsh plaintiffs alleged an ongoing and continuous nuisance with bodily injury for a period of 2007 to 2010, which implicated the three insurance companies' policies here. Were there any rulings in state court that would implicate the allegation of kind of one continuous ongoing loss or nuisance? In this particular case? In the underlying action, were there any rulings by the state court before the trial, any kind of motion practice, motions in limine that defined the loss in a different way than the complaint alleges as an ongoing nuisance over a several-year period? The honest answer is I don't know. I did not review the underlying course of proceedings. I do know it went to a verdict in favor of the Sandstone defendants. Whether any part of the case had been knocked out or not before that, I do not know. Okay. So at the time the suit was tendered here or notice was given to the three carriers involved, before you look at the other insurance provision, the claim, the Marsh complaint, implicated all three policies because it was conceivable that there could be a loss that occurred at any particular point in time during that three-year period. And so as a threshold matter, the coverages of the policy were implicated before you look at exclusions, before you look at the other insurance costs. And so that is the loss in this context because, again, the duty to defend is defined up front when a suit is filed, and the duty to defend is broader than the duty to indemnify. So in the absence of any – Is that always the case, even if there's a verdict? Well, I would say yes because, again, under Illinois law, the duty to defend, you don't get to the verdict or a resolution of the underlying case until much later. So at the outset of the case, the insured wants to be defended, whether or not it ultimately prevails, and the insurance company either has to provide that defense without knowing if there's going to be an indemnification issue down the road, and it has to either reserve its rights or file the tech action. Mr. Orlando, at the outside of the litigation here, your client took the position, did it not, that you are, in fact, an excess insurer? We did under the other insurance provision. Right. So I got two questions. Number one is can you – I think I got it, but can you just articulate the factual basis for that? And number two, kind of bleeding into the estoppel issues in the case,  where you all or your client is not speaking to the 9-10 policies, only the – that's what touches off this whole mess, in my view. Yes. So let me start with the first question, and I think it goes to what Judge Saini was alluding to, the prefatory provision of the other insurance. So our position is that prefatory position applies here. If other valid and collectible insurance is available to the insured for a loss, we cover, because, again, the lawsuit alleged a continuous ongoing that could potentially trigger all three insurers' policies. So that was met. Then we look to subparagraph B. I think the parties agree that there's only one provision in there. It's B subpart 2 that could apply. This insurance, that is the IINA insurance, is excess over any other primary insurance available to you covering liability for damages arising out of the premises or operations or the products and completed operations for which you have been added as an additional insured by attachment of an endorsement. So the sandstone defendants, IINAs insured, were added as an additional insured by endorsement to the STAR policy. So that makes the IINA policy excess over the STAR policy. What does that mean? So what does it mean for the duty to defend? What does it mean to the duty to indemnify? Well, that's when you then go to the next provisions of the other insurance clause, paragraphs, subparagraphs 2, 3, and 4. So subparagraph 2 deals with the duty to defend, and subparagraphs 3 and 4 deal with the duty to indemnify. Under subparagraph 2, with the respect to the duty to defend, when this insurance is excess, and we now know it is over the STAR policy, we, IINA, will have no duty under coverages A or B to defend the insured against any suit if any other insurer has a duty to defend the insured against that suit. So in this case, STAR and Westfield stepped in to provide the defense. This clearly says that IINA has no duty to defend when it's excess. That does not mean that it may not have an obligation for a later loss. If the Sandstone defendants had lost and there was an indemnification obligation, that's addressed in subparagraphs 3 and 4, and I think that's what was lost in the district court. And I think your argument is that on B2, the fact that STAR stepped in shows, and Westfield stepped in,  they did, and I believe one of them did not, did step in without a reservation of rights, and I can't remember. I think that was STAR. I think it was STAR. So one of them acknowledged the duty and stepped in. Westfield also stepped in, although under a reservation of rights, but never pursued that issue. So we believe that that was met. If at the end of the day the Sandstone defendants had lost and there was a verdict against the Sandstone defendants, then you look to subparagraphs 3 and 4, and there are possibilities there where on the indemnification obligation, IINA would be excess to STAR but primary with Westfield. So in our view, the other insurance provision is just, it's a roadmap. You just read right through it, and you apply these factors that we've discussed, and you come out with the only conclusion that can be reached, which is that IINA did not have a defense obligation in the suit. So why, when you wrote your letter back, didn't you refer to the 910 policies? Well, the answer is in the record that's not clear because the record does not have testimony or evidence that explains why only the first two policies were identified and not the renewal policies. As I've argued in the brief, I believe it was akin to a scrivener's error because I believe all the parties acted as if the intent was to apply to both. And, in fact, on that point, and I did not have this in my brief, but Mr. Brian Bradshaw testified and asked this question about why he authorized the letter of the law firm to withdraw the tender of defense, which then allowed the DEC action to be dismissed. And he said, our defense against the insurance company, I'll do the whole thing, is my understanding with discussions with Hollis, his partner, that we would have to personally defend and pay for our defense against the insurance company in that DEC action. And at that time, we didn't want to do that and spend the money to defend ourselves to try to get your insurance company to come into the case. I think all the parties understood that IINA was going to be out of the case with the withdrawal of the tender and with the dismissal of the DEC action. And the fact that the two other policies, which are renewal policies, it's the same policy, it's the renewal, it's clear from the record that the parties acted as if and understood that IINA was then out of the case. It's curious because when Sandstone sends its initial general liability notice in August of 2010, it includes all of the policies. It does. And then after that, the reference from both sides, Sandstone and indemnity, is just to the 08 policy, which seems strange. It is, and I've scoured the record. I cannot find an explanation for that in the record, but obviously our argument is that the parties acted as if, all the parties acted as if it was understood that the withdrawal was under all the policies and that IINA at that point was no longer in the case. Was there ever a point in time during the three-year period from the end of 10 to the end of 13 when the so-called re-tendering occurred and all that? Did anybody reach out to your client and say, hey, you guys aren't at the party and you need to be? I don't believe so. There's nothing to that effect in the record. So you had, and that's part of our argument, is that IINA believed it was out, and I think the Sandstone defendants acted as if IINA was out. Maybe I'm wrong. Maybe Star and Westfield will tell me different. But it seems to me that if I thought that you should be shouldering some of the defense costs as the tort litigation is playing out, I would have so indicated that we're getting tired of writing all these checks ourselves and we don't think you're an excess insurer or whatever the position would be. As far as I'm aware, there's nothing in the record from any of the parties, the other two insurance companies, the Sandstone defendants, asking IINA to come back in or to say you should be here. What happened was the underlying case was going to a mediation, I believe on the eve of trial, and the Sandstone defendants at that point wanted to bring IINA back in, I would argue, for a potential indemnification obligation, which they did reserve in the letter. So they released IINA with respect to the duty to defend, but they expressly said we reserve our rights on the duty to indemnify, and the case was going to a mediation. And that's what prompted the Sandstone defendants to get IINA involved again, which was fine as far as it went in terms of the indemnification obligation, but it didn't mean that there was now a renewed defense obligation. And I didn't see anything in the record where Sandstone reached out to your client saying, ah-ha, we withdrew our tender of defense to the 08 policy only, but we never did as to the other policies. That's correct. They never did that. Okay. And, again, I would argue that even the retender under the 08-09 policy in 2013 would not seem to make sense if they thought that IINA was already there or should have been already there under the renewal policies because they didn't intend to withdraw the tender as to those. Again, I think the Sandstone defendants in the testimony makes clear they understood at the time that IINA was out of that case at that point in time. Yeah. So is your point that when you look at the classic estoppel situation of insurer abandonment or intentional dereliction of duty or something like that, that this isn't that, this is more just a total mess of inadvertence and oversight and definitely not abandonment? I mean, your position was clear. Yes. It's inadvertence. It was not intentional. There's no case that we found that addresses the situation. The cases deal with an insurance company that hides from its obligations and refuses to defend. I mean, IINA did more than it had to do. It filed both a deck action and offered to defend under a reservation of rights. Under Illinois law, it only has to do one or the other. It did both. There would be no reason to do that with respect to the first two policies but not the latter two policies. Do you want to reserve the remainder of your time? I do. Very good. Thank you, Mr. Orlando. We'll now move to Mr. Postel. Thank you, Your Honors. Good morning. Good morning. May it please the Court, I think I'll begin by taking up some of the questions that the panel has asked. First of all, as far as the upcoming mediation and impending trial prompting the request by Sandstone for IINA to get back involved, that's not correct. The letter from Sandstone's counsel, Jennifer Martin, asking IINA to get back in the game was prompted by the Hilltop View decision of the Illinois Appellate Court, which came down the previous month. And that decision, which was on all fours, held that the pollution exclusion of a CGL policy does not preclude a duty to defend a CAFO nuisance suit, just like this one. So at that point, Sandstone realized that IINA's original coverage position asserted in their 2010 deck action was erroneous. Those were two separate letters, though. Sandstone sent the letter informing indemnity of the Hilltop decision, and then about a week later sent a letter asking them to agree to participate in the defense. And that second letter was close to the mediation. Okay, that could be. They were within a week of each other. So the letter informing them of the Hilltop action didn't ask them to come back in at that point. It wasn't until the subsequent letter. I think that was only a week later, however. I don't remember for sure, but they were very close in time. In any event, continuing with the, there was a question about whether IINA ever mentioned the 09-10 policies in any letter at or after that time. And the answer is yes, they did. The first letter requesting that IINA resume defending, I believe, did not refer to the 09-10 policies. But that letter then prompted IINA to file a second declaratory action in 2014, which only addressed the 08-09 policies. And subsequently, INA sent, I'm sorry, Sandstone sent another letter to IINA saying, hey, by the way, we'd also like to tender under the 09-10 policies. And I believe the letter referred to subsequent policies as well. Shortly thereafter, IINA filed an amended complaint in the 2014 D.J. action addressing the 09-10 policies. But by the time they did that, it was three years and nine months after they had notice of the suit and noticed that they're- What happened in that, what happened, Mr. Postel, or what's the record show happened in that three-year window? Did your client ever go to Sandstone or ever go to indemnity and say, hey, you need to get involved here? We think you bear some of these defense costs that we're writing checks for. Not that I know of, Your Honor. Okay. And so doesn't- I didn't see anything either that anybody's talking about in the briefs. And the question that comes to my mind, if that's right, that the record is silent on that, why isn't Mr. Orlando's, you know, conclusion that he draws from this big mess that this is just inadvertence in oversight? I mean, it's all that happened. Well- Kind of hard to understand that insurance companies are obsessive about detail. I'm not obsessive about detail. If nothing else, they're obsessive about detail. I mean, we hear that in this courtroom all the time. And so when you sit here and, yeah, they just kind of screwed it up and they didn't reference the right policy in the time, you think, insurance companies? Really? Well, that's exactly our point. That seems to be what happened. That's exactly our point, is that they're a big insurance company. They know what their policies provide. They know the terms of their policies. Do you think of any good reason, though, for them not to come forward and say, hey, we're excesses to 910 too? Could you repeat that question? Sure. What possible reason would they have for not, at the very outset of this, if they could redraft their letters, saying we're excesses to 09 and 10 as well, not just 08, 09? I just can't think of a reason why they would screw the letters up like that, other than inadvertence. Well, there's no compelling evidence in the record that it was anything but inadvertence. But I think it doesn't matter what the reason was. They're a party to a contract, the insurance contract. They have to perform their obligations. And if they don't do it, then they have to suffer the consequences. But the estoppel doctrine rests on the principle that it is there to prevent insurers from simply refusing to defend or sitting on their hands and leaving the insured out there. And indemnity certainly didn't sit on its hands here. It filed the declaratory judgment. It offered to defend under a reservation of rights. That seems completely counter to the policies behind the estoppel doctrine. Well, their primary argument on appeal is the other insurance clause. I know, but this is a separate. I want to respond to what your response just was to Judge Scudder as to the contract controls here. But the estoppel is not a contract argument. The estoppel is grounded in the principle that we don't want insurers who have contracts and have a duty to defend sitting there and just not doing anything and leaving the person who's insured or the company that's insured up in the air. And here, indemnity certainly didn't sit there on its hands and do nothing. It responded. It filed the declaratory judgment. It did exactly what it was supposed to do. They never raised their other insurance clause in any pleading until 2017, seven years after the suit was filed. And your client, actually, I don't think it was 17. It was 2014 when they raised all the insurance clauses. They did not raise the other insurance clause in 2014. When they moved to amend their complaint in the 2014 action? That was for the purpose of adding the 0-9-10 policies. Correct. Never raised the other insurance clause until they filed their motion for summary judgment in 2019, nine years after the Marsh suit was filed. Now, they did file a boilerplate affirmative defense in 2017, which is still seven years after the suit was filed. They filed a boilerplate affirmative defense to Westfield's DJ complaint in 2017, where they didn't even get specific enough to say that they were excess. They simply pointed out that they have another insurance clause. They didn't even quote it. And according to the Cordy construction case, which I encourage the court to read closely, that's an Illinois appellate court case from 2001, that is not enough. You can't preserve the insurance company's rights by filing an affirmative defense. You have to bring it before the court in a complaint for declaratory judgment or a counterclaim for declaratory judgment. That's what the Cordy court said. IANA never did that. The only time they brought it to the court's attention was in 2019, in June of 2019, when they filed their motion for summary judgment. So your point is that before that, they were leaning entirely on the pollution exclusion, and Hilltop pulled the legs out from that. That's correct. And then they came up with this contrived defense that somehow the prompt notice condition had been breached, even though they had notice of the suit within a month after it was filed in 2010. Now in 2014, they're arguing that the retender somehow breached the prompt notice condition. And that was the sole basis of the motion for summary judgment they filed in the 2014 case. Does the record establish that Westfield had awareness of the policies that Indemnity issued early on? Like back in what would have been around the 2010 time period. When did Westfield first know that Indemnity could be involved in this? Well, I believe Westfield knew about Indemnity's 2010 declaratory action. Right. And that's what prompts me to ask, why didn't, maybe not you literally, but why didn't you pick up the phone and say, you guys bear some responsibility here. Get in the game. Well, I don't know that they knew about the 2010 action at the time it was filed. I think they knew sometime later. I don't really know. It's not in the record. Were they copied on the letters? Was your client copied on the tender of defense in response to the tender? I don't actually know that. I'm guessing that at some point my client knew about them because they were defending Sandstone. I'm assuming Sandstone would have passed those letters along. I should point out that if INA intended to rely on its other insurance clause, if they intended to be excused from defending based on the existence of other defending insurers, then according to the Pekin v. Rada case, which I cited in my brief, it was incumbent on them to name Westfield and Starr as parties to the declaratory action in order to give us notice and an opportunity to be heard. They didn't do that. And I think probably the most obvious reason they didn't do it is because they weren't even asserting their other insurance clause. Mr. Postel, same question I posed to Mr. Orlando. Is there value to having the Illinois Supreme Court on certification speak to some of these issues? We've got a district court opinion here with a series of eerie guesses. A series of what? Of eerie guesses. And when that comes before a court like us, one of the things that we think of is our local rule 52, is this something that Illinois should be pronouncing on? Your thoughts? Well, I mean, I don't think it would be ridiculous to do that, certainly, but I don't think it's necessary. I think the court has enough. Admittedly, this is a complicated case, and some of the answers may not necessarily be terribly clear. I don't think certification is necessary. I do want to point out that Cordy construction case, if you read it carefully, you'll see that what the case stands for is that the duty to defend is not excused by the mere existence of another insurance clause until you come to court and get a judge to sign off on it. Without saying so, they portray themselves as being in the same position as a true excess insurer, that is, an insurer that writes a policy that's designed to incept only after the exhaustion of underlying primary coverages, which are listed in the policy. That's not what INA is. They are a primary insurer, just like Westfield and Starr, and they are excess by coincidence if they're excess at all, meaning they're primary. They're only excess in very limited circumstances, which it's their burden to establish exist. They never established that those conditions exist, and they never even filed anything in court to plead that those conditions exist. So it's too late. For nine years, they didn't do any, even assuming that the court agrees with the merits of their argument, they didn't bring it to court for nine years. So even if they're not estopped, their duty was never excused, and they owed the defense the whole time. Let's see.  I'm just looking at my notes of the court's questions. So I forget. One of the judges asked a question about the outset of the litigation. Was something said by INA about the other insurance clause? I think that's what the question was. And I don't know if you're referring to a letter or a pleading or what, but if it was in a letter, that's not enough, according to the court of construction case. You can't just say, I have an excess clause. Go away. I don't have to do anything. Last point, or one of the last points. The fact that they filed a declaratory action is immaterial to the question of whether they excused their duty to defend. Because in 2010, they did not reference their other insurance clause. So the fact that they filed a declaratory action on some other subject is immaterial. In 2014, same thing. How is it immaterial if Sandstone isn't pursuing that against them? Why is it immaterial? How is it immaterial if Sandstone isn't writing them or telling them, you filed the declaratory judgment action on 08, but we're still pursuing these other two policies? From everything I've looked at in the record, Sandstone never told them that. Well, with respect, I don't think it's Sandstone's job to correct INA's coverage position. These are hog farmers. They're not insurance professionals. Well, it's duty to defend them. Of course it is. I'm sorry? It is indemnity's duty to defend Sandstone. Of course it's their obligation to let them know what they're seeking to be defended on. They did ask for a defense. And the 2010 declaratory action was based on the pollution exclusion and no bodily injury, both of which are erroneous coverage positions. And they filed a declaratory action putting Sandstone under duress. Sandstone was already receiving defense from Starr and Westfield, and they didn't want to have to spend money to defend themselves against a declaratory action from INA that pertained only to defense. To suggest that that was a knowing decision by Sandstone that they don't want a defense from INA is just reading way too much into it. It's bending over backwards to look at the circumstances in the light most favorable to the insurer, which is not the standard. Thank you, Mr. Postel. Thank you, Your Honor. Mr. Zimmerman, you'll be next. Good morning. May it please the Court, I am going to briefly address INA's specific excess insurer arguments as directed against Starr Insurance Company. I think that the focus here on why INA is not excess in this situation is that for the nine-month period between November of 2008 and August of 2009, INA was the only insurer on the risk. And if you look at the introductory paragraph to the other insurance clause, it says before you look at the coverage limitations that might be in the other insurance clause, first you determine whether there is valid and collectible insurance for a loss. We cover that being INA covers under Section A and B. And as we noted in our briefs, you go to Section A in the INA policy and it says it cabins their coverage for loss from injury in the policy period. And so for that nine-month period, at a minimum, there was no valid and collectible insurance beyond their policy that would apply to the losses that were being alleged in the underlying Marsh complaint. We believe that the District Court also correctly ruled that the breadth of the allegations in the Marsh action also support the conclusion that the excess clause in the other insurance condition does not apply. Here in the briefs themselves, INA acknowledged that there could be instances where they would have a primary duty to indemnify. And we know that the duty to defend is broader than the duty to indemnify. So it's difficult to reconcile how they wouldn't have a duty to defend while having simultaneously a duty to indemnify. But the other insurance clause, even the excess portion in B2, it doesn't say that if this policy is excess for any portion of a complaint, we will not have a duty to defend. And here it is clear that the coverage that was provided by the STAR policy was quite limited as compared to that provided by Sandstone. STAR, the additional insurance endorsement, said that the coverage would be limited to situations where Sandstone was liable for the actual omissions of Red Oak. And we know from the Marsh action, at the Marsh action, the actual specific factual allegations all went to conduct from Sandstone. There's no reference specifically to Red Oak. The reason why STAR stepped up and defended is because of the broad reach of the duty to defend doctrine in Illinois and the factual uncertainty portion of the doctrine, which says if there's any factual uncertainty, you still have a duty to defend. And to answer one of the questions about whether we had defended without a reservation of rights, I forget the actual exhibit, but in the record at document 93, we did attach our response letter where we agreed to defend under a reservation of rights, and we specifically alleged as a basis for potentially denying a duty to indemnify the pollution exclusion. But here we have a situation where IANA was the only insurer on the risk for a nine-month period. But isn't the question under the introductory language to paragraph four, other insurance, isn't it whether or not there is a loss that both policies cover, not whether there are losses that only one policy covers? The way it is written, if other valid and collectible insurance is available to the insured for a loss, that reads to me as if what matters is whether or not there is a loss that both policies cover. There is a loss. First, you look at whether the loss is covered under the IANA policy, and you go to section A. That is what the introductory paragraph tells us to look at. It tells us to look at what does section A say. Section A says we cover loss during that policy period. And we know that there was a nine-month period where IANA was the only insurer on the risk, and so there was no valid and collectible insurance, and that is why it compels the conclusion that the other insurance clause, the limitations, didn't come into play to begin with. Thank you, Mr. Zimmerman. Thank you. Mr. Orlando, five minutes in rebuttal. Thank you, Your Honors. I'm going to pick up where you just left off. I think, Judge Eve, you are correct in the interpretation of a loss under that introductory paragraph. And the way to look at it is this way. I do not believe that in the Marsh action that any one of these insurance companies could say, well, we're not going to defend because what's alleged doesn't implicate only our time on the risk. In other words, it was alleged a three-year period. None of the insurance companies involved here could say, well, we're not going to defend because we're only on it for a piece of this three years, and there's two other carriers that are on it for another piece. Once you're in to defend, you're in to defend in whole in no small part because the underlying lawsuit is a continuous tort. That's right, and that's Illinois law. If coverage is triggered, you're in to defend the whole case. You may not have indemnification for the whole case. That's a different issue down the road. But you're in to defend the whole case. And so if there's no other insurance clause here, these three carriers are in for the whole case. So that's why the introductory paragraph is triggered. And don't you have to read the word loss in connection with the word suit? Yes. As it's used? For purposes of the duty to defend, yes, because, again, the indemnification, you're not going to get to that until a long time down the road. Up front, when the suit comes in, the analysis is do we have a duty to step in to defend? And any loss, a loss, that would be covered within the context of that suit triggers the obligation for the whole case, the whole suit. That applies to all three carriers. Counsel for Westfield, I think, acknowledged something important, which he did say that there's nothing in the record that would suggest anything but inadvertence with respect to why the 09010 policies were not identified in all of the correspondence. All right, so what does that mean for Estoppel? And I think Judge Evie, you are correct. Estoppel's grounded in the law. It's Illinois law that sets forth a standard for when we're going to apply Estoppel and not allow an insurance company to pursue a particular defense. All right, let's wind the clock back to 2010. In 2010, IINA wrote a 12-page reservation of rights letter, which did mention the other insurance provisions in that letter, and offered to defend under a reservation of rights. Under Illinois law, that's all it needed to do. The fact that it chose, in addition, to file a deck action that added or talked only about the pollution exclusion does not affect the Estoppel argument. What happened after that, as we've seen, is that Sandstone said we don't want to defend the declaration, the declaratory judgment action, so we're withdrawing our entire defense. And so the reservation was made. There's still no Estoppel. IINA reserved its rights on the other insurance provision, among other things that were in the reservation of rights letter. Yeah, that reservation of rights letter, though, I have it right in front of me. I mean, the lion's share of that is about pollution. It is. There's no doubt about that, and that was a key issue at the time. But that also makes sense because IINA, at that early juncture, may not have had the STAR policy, may not have had the Westfield policy. Other insurance issues, in order to pursue an other insurance issue, you have to look at the other insurance provisions of all insurance companies because Illinois law has said if they're mutually repugnant, if each one says the same thing and, in fact, they're both triggered, then no insurance company can apply that. And so I think it would have been premature to file a suit on the other insurance provision at that point in time. As it turns out here, there is no mutual repugnancy. We haven't addressed that in the argument, but we have addressed that in the briefs. The only one that applies here is the IINA one, and so it was triggered, and there is no Estoppel. However, if the court is inclined to go in that direction, I do want to note that Westfield's counsel said it would be reading way too much into the record to resolve the Estoppel issue in favor of IINA. If the court's inclined to read it that way, well, then that necessitates, I guess, a trial on what all these parties intended when they wrote these letters. What Westfield and STAR want to do is get a summary judgment based on the Estoppel issue. They can't get summary judgment on this issue if they believe there are all these underlying facts that are unclear. Our position is it's very clear from the record what happened, that Sandstone defendants withdrew the defense for the entire action and both policies. That's what Mr. Bradshaw testified to. That's very clear. I see my time has expired. Thank you, Mr. Orlando. Thank you, Mr. Postel. Thank you, Mr. Zimmerman. The case will be taken under advisement.